All right, we're all here. Ms. Butler. Thank you, Your Honor. May it please the Court, Megan Butler on behalf of Jeld-Wen. In 2018, Steves argued that it could not build its own doorskin plant and that it faced the irreparable harm of going out of business without divestiture. This Court affirmed divestiture on that basis, but it left open the possibility that, quote, the District Court may have to revisit its ruling when it came time to issue a final judgment. In the five years since, that central premise for divestiture, the threat to Steves' survival, has entirely evaporated, and it did so before any final judgment issued. Today, Steves has actually built its own plant, and it faces no risk of folding with or without divestiture. That is admitted and undisputed. The District Court expressly stated in its decision, quote, Steves no longer faces the risk of extinction. That extraordinary and undisputed fact alone warrants Rule 60b-5 relief. As the government explained in this case, under CASA, only Steves' continued irreparable injury is a legitimate predicate for divestiture. Now, Steves is trying to speak today on behalf of others, on behalf of independent doorskin purchasers that don't have their own plant, and it says that divestiture is needed to help them. But Steves is no longer an independent, and it can't obtain relief on their behalf. In fact, the only actual independent that has weighed in here has said that divestiture will harm it, not help it. The District Court's refusal to revisit its decision and vacate the divestiture requirement was error. Now, I want to start with where there's some agreement in this case. Gelwin and the government agree that divestiture is only appropriate if Steves has ongoing irreparable harm. See, when you said agreement, I was hopeful and optimistic that you were going to tell me something that you and your adversary agree on. Now you're just telling me you and something one of your amici agree on, which isn't really what I would normally call as agreement. But can I take a step back further? I think you're sort of walking the line more delicately than the rest of you. Can we just all agree that the question before us is not whether equitable relief would have been warranted in the first instance? Yes, Your Honor, we agree with that. Would you agree that in order to avoid a 60B modification of a judgment, a party does not have to start at the beginning and prove their case all over again, because that would completely undercut the limits of 60B? Yes, we agree with that and we're not asking Steves to do that. Except you are, though, because you seem to be suggesting over and over again the question is whether they could satisfy one of the requirements for injunctive relief if we were deciding that question de novo today. And I just don't understand how you can possibly square that idea with 60B. So, no, Your Honor, let me clarify what we're saying. Gelwin bore the burden and Gelwin satisfied its burden of showing that the original irreparable harm doesn't exist. Now, that is where we all agree. Even Steves, our adversary, agrees. There is no longer the original irreparable harm that led to divestiture. Gelwin had that burden and it satisfied that burden. We are entitled to Rule 60B-5 for relief at that moment. Now, that does not mean that Steves cannot now say, well, things have changed. We have new injury and we need a remedy to remedy that injury. Sure. But if Steves wants to do that... In our previous decision, we vacated a future lost profits award for them on the theory that they were going to get divestiture. So, just so we're clear, if you were to win this issue, the issue of future lost profits comes right back on the table, right? No, I don't agree, Your Honor. What? That was the entire basis on which we vacated it in our previous decision. Sure. So this court did vacate the lost profits award, but it did so because it was based on a future uncertainty, whether Steves would go out of business. The issue was, if divestiture doesn't happen, then what we suspected would happen, what the jury suspected would happen, is that Gelwin wouldn't give Steves door skins, and that would force Steves out of business. So it needed the lost profits of not being in business, eight years worth of its business profits. What the court said, what this court said in 2021 was, well, if that might not happen, Gelwin might all of a sudden decide to give Steves those door skins, and that's why we have to vacate the lost profits award. It's based on a future uncertainty that might not happen. So if I just, if I simply read a different opinion as fundamentally not saying that, if I read it as saying the reason we're vacating this award is because of the divestiture order, you agree that would reopen this topic, right? I mean, with the caveat that I disagree about the reasoning, it might reopen the topic, and that would at best be a reason to remand this for a determination as to whether the speculative future lost profits have now, you know, there's now harm that would merit future lost profits. But again, I think that that was based on the idea that there was future harm of Steves going out of business. That's not true anymore. Steves will not go out of business. And Steves counsel said below, quote, at JA 489, it's true that we won't go out of business once we have a plan. And the district court at JA 2539 says Steves no longer faces the risk of extinction. But that suggests undisputed fact. That suggests that some of the irreparable harm and maybe most of the irreparable harm that formed the basis of the original order no longer exists. But you jump to saying that's that they've essentially conceded they have no irreparable harm. And I'm not sure where they've conceded that. Let me clarify. They have conceded that they do not have the original irreparable harm that led to divestiture in the first place. That was the whole thing in 2021. What this court found is that they go out of business as the only future harm proven. And so it needed the extraordinary remedy of divestiture to solve that. I agree with you that Steves is now coming forward and saying, well, wait, we have new irreparable harm. There are at least two problems with this. One, as a legal matter, you cannot sub in new irreparable harm into an old equitable analysis. This is a real heads I win, tails you lose analysis. So when things change that benefit our client, the client who lost and had a judgment against them affirmed, your view is anything that changes that benefits us reopens everything. But anything that changes that benefits them is off the table. That just seems positively bizarre to me. No. And I agree, Your Honor, that's not what we're saying. What we are saying is that Gelbin was entitled to relief from divestiture when it proved that there was no longer irreparable harm. Now, Steves can come forward with new irreparable harm, and it did. However, it can't say new irreparable harm fits the old equitable analysis. If Steves wants to prove new irreparable harm, it needs to reprove the eBay factors and show that the remedy it's seeking is tailored to that harm. See, now I'm right back to right. You're right back to that. This is again, I feel like at every point someone pushes that this doesn't really work on 60B. Your response in your brief and your response in oral argument is to go back and assume that we're just deciding today whether we should order this and just gut the entire 60B part of it. Again, Your Honor, I disagree, and the government in this case has said that what we need. I have a bunch of questions for the government, I assure you, about their view of CASA, which strikes me as an egregious overreading of CASA. Fair enough, but even at a minimum, we all agree that the original irreparable harm is gone, and you do need irreparable harm for injunctive relief. Now, there are two problems, and I just want to get to the second problem. Counselor, let me ask you this, because of what we do, we do what you are asking us to do. How does that impact finality? It seems as if it would undermine the Brown Shoe two-step process. I mean, we're just going to keep going back and forth. How does that impact finality? Sure, Your Honor. So, I think we have two arguments here. One is under Rule 60B-5, and again, that is that in this particularly territorial circumstance where we have a concession that the original irreparable harm is gone, Geldo is entitled to Rule 60B-5 relief. Now, on your question, you're talking about Brown Shoe and the second step of the two-part framework. For that, I think it's important to remember that when this court originally ordered divestiture, it said that the district court might have to revisit its original divestiture decision, that Geldo could challenge the ultimate buyer. There was never going to be a world in which there was no uncertainty, and that, I think, is a mistake and is a little unclear from Steve's brief. They suggest that any uncertainty at all would undermine the framework. That's not true. There was always uncertainty, and the Brown Shoe framework actually would have worked in this case. We would have divested, and we would be done here as of 2022 when we had a bidder, and the special master recommended divestiture. Geldo defended the recommendation of the special master, said that we should divest. The reason that fell through, the reason Brown Shoe didn't work, is because Steve's objected to that bidder because it wanted to buy the plant. That's what derailed the process, and then in the second round, we were again ready to divest. We had a bidder. We entered into exclusivity with that bidder. We were doing intense negotiations, and it was that bidder that pulled out. It was not Geldo. When we're talking about the Brown Shoe framework and whether it's impossible, I think it just doesn't comport with the facts of the Brown. Geldo was prepared to divest, and it all would have gone to plan. The change was that Steve no longer faces the basis for his irreparable injury. It does not face irreparable injury. I just feel like the last several minutes of your argument, I feel like I'm just hearing Justice Harlan's dissent in Brown 2. I feel like everything you're saying is Justice Harlan's dissent in Brown 2, and I don't know what to square with that. I mean, I disagree. How is this final? It'll be subject to being redone over and over again. Everyone's going to have to—like, that's everything that Justice Harlan argued in dissent in Brown 2. Brown Shoe, sorry. Okay, well, I think the majority in Brown Shoe said that we want to avoid relitigation of settled issues, for example. To begin, we're not asking to litigate any settled issue. No court has actually decided that divestiture is in the public interest today. No court has answered that question. Okay, and follow-up question. What court says that at a 60B analysis you reweigh the equitable factors? I can't find a single decision that says that. And to be honest, we're not asking that. So I just want to separate the two parts of our argument. One, we have Brown Shoe Step 2, which says there are new questions that have never been resolved, including whether it's in the public interest for this to happen. On those questions where this court said the district court's going to have to look again and may have to revisit its analysis, on that step, there's been no relitigation. There are new questions. Now, to your question, Judge Huygens, on Rule 60B, gentlemen had the burden and carried the burden of proving that there is no original irrevocable harm. Not only that, there is no evidence of any irrevocable harm. And I want to talk about Steve's new irrevocable harm. Steve has said that it's received some defective door skins and that it's new irrevocable harm warranting divestiture. Defective door skins, a defective widget, is classically compensable. So what it has said is that actually the defective door skins are going to affect its goodwill and reputation. It is two pieces of evidence. One is a declaration from Sam Steve saying it has received defective door skins. And two is an Ermings Call transcript where gentlemen CEO said there's been some quality problems and it's working to fix those quality problems. There is no evidence that a single customer even knows about those defective door skins, let alone that a single customer's perception of Steve's reputation has been affected. There's no evidence that the merger caused those defective door skins. They could have been caused by an aging employee workforce, the retirement of a key employee, a broken machine. All of those could have caused the defective door skins. There's also no evidence that these defective door skins are going to cause future harm, that they're going to continue into the future. In fact, the Ermings Call transcript that Steve cited has gentlemen CEOs saying that we're going to try to fix the problem. We're not going to keep getting you defective door skins. Corporate litigants come to this court every day seeking emergency relief because a contractual counterparty has given them something they don't want, a defective widget. And what this court says, this is Williams and DiBiase, is that you need evidence of irreparable harm. If this court says that a defective widget is enough to establish irreparable harm, I suspect that you're going to receive a lot more emergency applications for relief. And that's just not the law. Now, we have no irreparable harm left to solve, but we've also solved some other problems. This court in 2021 wanted to get rid of the duopoly between Gelwin and Masonite. Here's what Edward Steeves had to say about that. Gelwin and Masonite were, quote, pretty much a duopoly. And, quote, when we put our plant in, that's going to eliminate that and give more choice to our customers. That's at JA 983. This court also wanted to help the independents, and it thought that divestiture was necessary to protect them. Now, Steeves and Woodgrain are making a lot of claims on what will help the independents. They are not independents. They both have their own plant. The only independent that has weighed in here has said that divestiture will harm it, not help it. So given the facts as they currently exist, we would submit that the court should hold that Steeves needs ongoing irreparable harm, the exact position that the government has taken in this case. It not only doesn't have the original irreparable harm. It has no other irreparable harm. And so the divestiture requirement should be vacated. Now, on the second step of the Brown-Chu framework, the point I'd like to emphasize is that there are questions that haven't been resolved. No one has considered whether a below-value price can be outweighed by defective door skins. That's never been resolved. I see my time is expiring, and I don't want to go over. If the court doesn't have any more questions, I'll reserve the balance for my rebuttal. Thank you, Ms. Butler. Mr. Horwich. Thank you. It may have pleased the court, Ben Horwich, on behalf of Steeves. So I'll certainly take the court's direction on what to address. But failing that, I guess I will start with 60B. And what Gelbman needed to show was a significant change of circumstances that rendered divestiture contrary to the public interest. And now significant in that test is not self-defining. We concede that. So we agree that Judge Payne had to look at his prior judgment and at the substance of law to gauge whether Steeves' progress on building a plant to serve some of its needs was significant. And, of course, Judge Payne knows this situation better than anyone that this case is now in its 10th year. And I'm sorry, I'm getting some echo. I don't know if that's me or someone else. But what he found correctly is that if you assume, quite hypothetically, that this Athens plant is operating at its theoretical maximum capacity, that that would not change fundamentally what this case has always been about, which is this. Steeves needs to buy door skins. It's not going to get a complete supply from its own plant, even if we're in the best case scenario. Steeves hasn't actually gotten a single usable door skin out of that plant at this point. So Steeves still needs to buy door skins. Steeves would still be dependent on Geldwin for those door skins. Geldwin would still have the power and incentive, that's a quote from Judge Payne at JA 2534, still have the power and incentive to withhold door skins from Steeves to poach Steeves' customers in the door market. That's what the economists call foreclosure. So Steeves is going to be unable to serve customers, and so Steeves is going to lose customers. Now, what's different here is, yes, if things go well with the plant, that is still a hypothetical, that's still an if. What's different is that the next step of Steeves then goes out of business may instead be Steeves loses a good number of its customers. But we have a term for losing customers, but not going out of business. That term is loss of goodwill. That's a classic harm in antitrust cases, and it's a classic irreparable injury. And so that really ends Geldwin's appeal on the 60B side, any way you slice it, because either you could say the change is not significant in the relevant antitrust sense of altering the competitive conditions and eliminating the power it has over Steeves to foreclose. You could do it in the language of the antitrust cases applying Rule 60, cases like United Shoe and Kodak, and even going back to Swift before the adoption of the federal rules, but that's an antitrust case, inequity, trying to decide what to do about a judgment. The purposes of the decree haven't been achieved. We still have this problem. Or you could go under the four-factor test and you'd say, well, we still have irreparable harm. And so any of those comes to the same thing. And I mentioned Swift because this is not a new thing. A hundred years ago in Swift, the court recognized, and I think this goes to Judge Heighten's point about how you have to have some value for the finality in a judgment like this. Swift said, I'm just quoting here from 286 U.S. 119, we're not framing a decree. We're asking ourselves whether anything has happened that will justify us now in changing a decree. The court goes on, life is never static. And the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. Do you think all of that, Swift, is good law? Because there's some language in Swift that I think comes a little bit later that I know is not good law anymore.  But attenuated to a shadow, you think that part survives the abrogation of the part of the language in Swift that we have abrogated? So the colorful language in Swift, I think, has been perhaps superseded by the language that I would give the court from United Shoe, which is, and this is United Shoe 391 at 248, a decree, quote, may not be changed in the interest of the defendants if the purposes of the litigation as incorporated in the decree, the elimination of monopoly and restrictive practices, have not been fully achieved. And so on that front, so there's other 60B cases that are more even recent than that, but those tend to involve government defendants. I guess what I'm trying to figure out is some of these later cases that involve prison regulations and things like that, where the court seems to make 60B even easier to get. But I'm trying to figure out in those cases how much of what's driving the analysis is that having a court enjoin the federal executive or a state is kind of a big deal from either a separation of powers or federalism. So we have like Agostini in cases like that. Because there are other cases that involve that setting where the court seems even more pro-change under 60B. And do you think those cases are just about government defendants? No, I don't think they're just about government defendants. But if I can venture an analogy, I think that cases like a Horn against Flores case or an Agostini case where you're talking about terminating a structural decree that's trying to reform, say, an entire prison system, a whole bunch of prisons, or reform an entire education system, a bunch of schools. I don't think the decree would be terminated if, well, some share of the schools, we fixed the problem, but there's still a share of schools where the exact same problem exists and the decree has yet to run its course. And I think it's a rough analogy, but that's the analogy here, which is it's true that Steves, again, in the hypothetical where Athens is up and running, it isn't. But in that hypothetical, we can hope that Steves will not lose all of its customers. But we're still in a situation where the exact same antitrust concerns apply, that Steves will lose a significant fraction of its customers. And that's the goodwill issue. And so you wouldn't terminate a decree that had accomplished reform at 60%, 70%? I don't know what the right percent of the relevant locations is if there is still work to be done. I think that's how I would square up those cases. And so from there, this court's review of this decision, which, of course, is for abuse of discretion, and there's good reason that review is deferential in this setting with a court that Judge Payne has had to sit with this case, as I say, for, we're coming up on a decade now, and has had to continue managing it even during the pendency of the prior appeal. This has been a continuous job for him in one way or another. And I think what he understood is... You addressed, like, I'm not sure how legally relevant this is, but, and look, there's a fair amount of finger pointing, like, why is this final sale price so seemingly bizarrely low? But I guess, and maybe I'll ask your friend on the other side during rebuttal, but, you know, their first shot is there was a great offer until your client blew it up because it wanted the plant for itself. Sure. Could you address that? I'm happy to address it. What we raised was really a question of law, which was that we argued at that point that the special master had disqualified us, or really his antitrust advisors, had disqualified us at the threshold because of the fact that we would become vertically integrated. And that is to say we also made doors. We wouldn't be making only door skins. And we thought that analysis was incorrect as a matter of law. And we said we should be in the pool. We didn't say you have to give it to us. We certainly didn't say that. And we certainly weren't there trying to blow up another deal. We genuinely believed and put in considerable evidence on why we thought the analysis was simply wrong and mistaken. And the fact that the bidder in that case decided to withdraw, there's not a record on what their reasons were. This is very much a post hoc ergo proctor hoc kind of reasoning from Geldof on that bidder. It's just that they left when they decided that, okay, we don't want to deal with this, I guess. Why did you announce your plant two days before the second round of bidding closed? So the announcement of the plant came in the context that we had to disclose what we were doing. We're not going to be there and say we're secretly doing this. I do want to remind the court that, and perhaps correct an inadvertent misstatement from my friend, the suggestion that we could not build our door skin plant is not quite right. What we said was we couldn't build it in time. The issue in the prior appeal was, or in the prior jury trial really, was that the supply agreement for us was going to expire in September of 2021. So the question was, could we build a plant in time to pick up where Geldof was going to cut us off? And this court recognized that point in the prior opinion. Steve's didn't abandon its interest in building one, and it was continuing to explore the possibility when the trial in this case began. So I'm happy to give the court a bunch more record citations for this. But it's not that we were lying or had some secret plan. We've always been forthright about that. This is an exceptionally difficult industrial project. If the court wants to learn more about this, they could go back and look in the record of Geldof's attempts to stand up its Dodson plant, which may very well be the last one built in the world. And that was started about 20 years ago. And so this is not easy. And although, as I've alluded to, it's happened after the district court proceedings closed. But we've been working, but we don't have any usable door skins out of our plant today. So from the point of view of this motion, if Geldof's position is that this motion should have been granted back in December of 2024, we'd be running on 13 months here with Geldof having the plant. In their view, the case is over. Steve gets no more remedies. And that's it, which I think can't be the correct answer here. I do want to respond to the point about these are just defective door skins, and we can pay for them, and we'll pay for them. That's not the issue. If the door skins are defective, you can't make doors with them, and you can't supply your customers. And there's a long record here that supported Judge Payne's entirely reasonable prediction about what happens in this market when Geldof has the ability to control supply. So go all the way back. Right in 2020-12, this is at page 700 and 701 of the court's prior opinion, right around the time of the merger, Steve started to see quality issues with the door skins. Then we had a bunch of the pricing and payment and reimbursement issues in 2013, 2014, 2015. That's all chronicled at JA 601 to 604. Then in 2019 and 2020, while the prior appeal in this case was pending, there was a separate lawsuit between Steve's and Geldof, and also before Judge Payne, because Geldof refused to fill Steve's orders during that appeal. That's published at 612 F. Sup. 3rd, 563, and Judge Payne is referencing that in footnote 11 of his 60B opinion on page 2526. And then in 2024, we have this defect rate skyrocketing again, which is basically withholding door skins from us. If you give us useless door skins, we can't serve our customers. So Judge Payne's view that this portended a loss of future goodwill is absolutely right, because that has been the pattern of this case throughout its history. And so if we're making a predictive judgment, which all of these are, it's prospective relief, this is absolutely well-supported. And from there, you get to the question of, well, is this the right remedy to go forward with? And as this court said in the prior appeal, divestiture is the remedy best suited to redress the ills of an anti-competitive merchant. That's how you address things here. And I guess I would close just on the point about CASA, because we haven't had the opportunity to address that. It wasn't in our brief. It had just been decided. CASA is addressing, I think, a circumstance that doesn't really fit the problem here. CASA asks the question, but what do you do when you have an injunction that's too big, bigger than necessary to redress the harms of the party in front of it? But in this case, what you have is divestiture, which is kind of a unitary, indivisible remedy. You can't peel away layers of divestiture. And so in order to remedy Steve's harms through the divestiture... So do you think the CASA analogy would be something like, let's say this injunction ordered the defendant to sell to people other than your client? Yeah. Yeah, that would be a correct analogy. And conversely, CASA gives, as a counterexample, a nuisance action, which I think is much more like divestiture in the sense that abating a nuisance might help, you know, the neighbor to, you know, might be brought by the neighbor to the north. I see my time has expired, but if I could finish the thought. Finish the answer, yes. Abating a nuisance might benefit the plaintiff neighbor to the north, but it's also going to benefit the neighbors to the south. But that's incidental and not a reason not to do it. That's the case with divestiture, too, which is that it is going to structurally repair things. But really, this is still benefiting Steve's. Thank you. All right. Thank you. Ms. Badaracco. Thank you, Your Honor. May it please the court. Anthony Badaracco from Dorsey & Whitney on behalf of Woodgrain. This court in its 2021 decision in this case held that Jeldwyn can, quote, challenge whether a sale to the particular buyer will serve the public interest. And Jeldwyn has done that, and that's why we're here. And I don't think there can be or is any legitimate argument that Woodgrain is not capable of or incentivized to operate the Tawanda facility profitably and successfully and in the public interest. Woodgrain's got decades of industry experience. It's a previous part owner of the facility. And critically, I think the court below found that even absent any demand at all from Steve's, based on Jeldwyn's own financial reporting before the divestiture, Woodgrain could profitably operate Tawanda. And, you know, I think the court, to the extent that Jeldwyn does challenge Woodgrain's suitability to operate the facility, should take any such argument with a grain of salt because since the divestiture, which closed a little bit more than a year ago, Jeldwyn and Woodgrain are direct head-to-head competitors for the sale of molded interior door skins. And so Jeldwyn's got every incentive competitively to undermine Woodgrain in the marketplace. Respectfully, I don't agree that the record from the court below supports the notion that the eventual $115 million sale price for Tawanda was anything less than a reasonable price and a fair price under the circumstances. Now, what are those circumstances? Well, of course, it was a forced sale. It was not an open market sale by a willing buyer, and bidders knew that. Jeldwyn got far more than the price that it had paid for Tawanda in 2012. And that doesn't even take into account the monopoly profits that Jeldwyn earned during the time when it owned and operated Tawanda. And there are a couple of critical factors that I think the court should also consider. Steve's wasn't the only party to object to a bid. Jeldwyn objected in the second round of bidding to a bid that would have led to a sale, pursuant to which Jeldwyn would have gotten substantially more money than it eventually got from Woodgrain in the third round of bidding. And so Jeldwyn bears some responsibility for the fact that the purchase price ended up where it was. The other factor is that Jeldwyn insisted on maintaining its right to an appeal, which of course it was perfectly, which is perfectly reasonable for it to do. But the reality of that is that Woodgrain knew when it was submitting its bid, that it wouldn't have certainty that it would continue to be the owner of Tawanda, and that affected its willingness to pay for the for the asset. Now, the final point that I'd like to make, if the court is interested, is to address just briefly Tawanda's performance since divestiture, based on a report issued by the special master that the lower court transmitted to this court. My time's almost up, but I'll briefly address that if the court would like. You may. Thank you. So in July of 2025, the district court charged the special master with visiting Tawanda, speaking with Woodgrain and speaking with Steeves and producing a report. The special master did so. And at docket number 2724 in the district court, Judge Payne ordered the clerk to place that report in the record of the Fourth Circuit. And the report indicates a few things that I think are pretty significant, that Woodgrain is committed to successfully operating Tawanda, that it had secured long term contracts with other customers, not just with Steeves, that the door skin defect rate had materially dropped since Woodgrain took over the facility, and that Woodgrain had committed millions of dollars in capital expenditures to support the facility's long term effective operation. And I just think those are all things that the court can and should legitimately take into account in weighing the equities that are presented here. Happy to take any more questions the court has. Otherwise, I'm happy to rest. Thank you, Mr. Bedrocko. Ms. Herzog. May it please the court, Ali Herzog on behalf of the United States here as amicus supporting Steeves. The United States has a strong interest in protecting the availability of divestiture as a key antitrust remedy. Even in private cases, divestitures can be an important supplement to government enforcement. I would like to focus on two points. First, antitrust injuries stem from harms to competition and thus are remedied by restoring competition. While a court may only give a remedy to the parties before it, antitrust remedies will often have incidental benefits for third parties because unfettering a market typically unfetters it for everyone. As counsel for Steeves mentioned, divestiture is much like the relief that might be ordered in a nuisance suit where requiring the defendant to turn down their music benefits the plaintiff's entire neighborhood but is still proper relief to give to the plaintiff. Here, the district court's findings show that Steeves is still suffering irreparable harms caused by the anti-competitive market conditions that necessitated the divestiture. While Steeves is no longer at risk of going out of business, the district court found that without divestiture, Geldwin will retain the power and incentive to deprive Steeves of the ability to meet its customer demand and to compete for new business. Having to transact business under these anti-competitive conditions continues to harm Steeves and to harm the goodwill between Steeves and its customers. Second, like any antitrust remedy, a divestiture should not be vacated unless its purposes have been fully achieved. The antitrust laws would be undermined if defendants could continually re-litigate relief before competitive harms have been eliminated. Here, Geldwin unlawfully acquired market power by buying Tawanda and the district court ordered divestiture to undo that unlawful acquisition. And this court affirmed. Thus, on its Rule 60 motion, Geldwin had to show that a significant change in circumstances has restored competition and rendered divestiture of Tawanda, the fruit of Geldwin's violation, no longer equitable. Geldwin's argument for changed circumstances based on a simple headcount of doorskin manufacturers is unavailable. The state of competition cannot be determined through such simple arithmetic. Can I ask you, you realize you only have a couple minutes, I just want to ask you about the government's position on CASA, which I've previewed that I think is way overbroad. Why isn't CASA a case about the scope of injunctive relief under the Judiciary Act of 1789 against the government, which I've just identified two rather big differences between CASA in this case. Under the Clayton Act, relief in antitrust cases, equitable relief in antitrust cases, is available under the same conditions as other equitable relief. It's just when I read CASA, there's a lot of stuff about how enjoining the whole government's conduct against the entire world is a really big deal and gets really pretty far from what courts and equities do for the benefit of people who aren't before the courts. And this just feels like a radically different situation. Like, I guess what I'll say, maybe the constructive, why is the Ninth Circuit's EPIC decision wrong? Because I just read that and thought, this seems right. What I would say is, I think that this decision, this case, similar to the other case, actually is really about what does complete relief look like for the plaintiff. And in an antitrust case, that looks different than it did in CASA. So as Your Honor alluded to before, in CASA, the relief was being ordered for the plaintiff and potentially also as applied to lots of other folks. In an antitrust case, relief has to be ordered or is generally ordered through the mechanism of restoring competition. And so what that means is there may be situations where relief, like a divestiture, you aren't really peeling off specific relief for the plaintiff. You're restoring competition to the market. And through that mechanism, you are fixing the plaintiff's harms. I'm sorry, I see I'm far over my time. I'm happy to finish the thought with Judge Hyde's question. Thank you. And so there may be cases, even with injunctive relief, where injunctions that are aimed, like in the Epic cases where injunctions that are aimed not solely at the plaintiff can still be serving the purpose of restoring competition and thus a mechanism for remedying the plaintiff's injuries. Here, because Geldwin failed to show that competition has been restored to the market, the district court properly denied its Rule 60 motion, and that decision should be affirmed. Thank you. Thank you. Ms. Butler, you have some time reserved. Excuse me, I'm sorry. Now you can hear me. I'd like to start where the government left off, which is the evidence of irreparable harm. So the government has said that there is evidence of irreparable harm in the record. But what the government said in its brief is that we don't actually know what that evidence is. You know what that evidence is. We all know what that evidence is. It does not exist. There is no evidence of a loss of goodwill or reputation. Now, Counsel for Steeves mentioned this allocation dispute from 2020, and the district court did the same thing. The district court said, Geldwin, you previously engaged in this allocation issue, and so you can be thought of as continuing with any competitive arms. But if we look at that allocation dispute, we have the same issue of causation. In footnote 4 of that decision, the district court, Judge Payne, said the record here is scant as to whether that antitrust violation, he's referring here to this antitrust violation in this case, caused the damages alleged in this case, and there is dispute as to whether the complaint alleges antitrust impact or antitrust injury. So in that dispute, Judge Payne could not conclude that we were using our market power to cause Steeves harm. I hardly think that that dispute suggests that we have market power that we're going to continue to use to harm Steeves. Likewise, in that case, there was actual evidence of irreparable harm. There was evidence that Steeves had to inform customers that it couldn't fulfill their orders. There was evidence that a future customer wouldn't do business with Steeves, and there was evidence that former customers had bonded gentlemen in Masonite. None of that evidence exists in this case. There is absolutely no evidence of irreparable harm here. The second thing counsel for Steeves mentioned is that this is a fact-heavy dispute, this implication being that we should defer to the district court judge. These are questions of law, Your Honor. It is undisputed, it's conceded in this case, that Steeves will not go out of business without the vestiture. Yes, it thinks demand for its products will increase. Yes, Steeves would like more door skins and the opportunity to buy more door skins, but it is conceded in this case, and the district court wrote in its decision, that Steeves' survival is not threatened. Now, the other thing counsel mentioned for Steeves is that perhaps United Shoes survives these institutional reform cases, and this was Judge Heighten's question. Eastman Kodak is an antitrust decree case, and in Eastman Kodak, the court said that the test is any significant change in factual or legal circumstances. Even if the purposes of the decree have not been achieved, there can be a change to an antitrust decree where there is a significant change in law or facts. That's Eastman Kodak from 1995. And so it's just not true. The test is a significant change in law or facts. The entire factual predicate for the vestiture being not true is a significant change in law or facts. And finally, I want to talk about the public interest here. So first, again, no court has considered whether it's in the public interest today for divestiture to happen. That just hasn't happened. Now, the government has said, well, the market has stayed the same, and so has the district court. That is legal error, Your Honor. That's not a factual difference. That's a legal error. Steeves' own expert at J1624, from an economics perspective, said, in fact, the market has changed with Steeves' new plan. And as a matter of law, at trial, the market that was defined was the market for all door skins used in the United States. That includes vertically integrated manufacturers. That's why Masonite, for example, who didn't make significant sales to the independents, was included within the market because Masonite made door skins that Masonite used in the United States. In the same way, Steeves is now making door skins that it is using in the United States. It is part of the market. It is a third competitor that has been restored to the market. And the district court's reasoning about the public interest turned entirely on the belief that the market was different and that there had been no change in the market. If the court just alone finds that there was a change in the market, like Steeves' expert says, and like the jury said, the market that the jury said existed, then there needs to be a remand because none of the district court's conclusions about any purpose of this litigation can stand up. Because again, the district court only found that the purpose of the litigation hadn't been solved because a completely different market hadn't changed. But that's just not the market. And now finally, there has been a couple of suggestions about how divestiture is working and how it might be hard to unwind divestiture. But I want to emphasize that Woodgreen accepted the risk of an unwinding here and Gelwin and Woodgreen contracted for the exact eventuality that there might be a remand in this case for better reasoning, for consideration of the equitable factors, or for a reversal. So with that, I would ask the court to reverse the decision below and vacate the divestiture requirement. Thank you. Thank you, Ms. Butler, and thank you all, counsel. I appreciate your arguments. We normally would come down and greet you, but we can't do that. But we do so virtually, and thank you so much for your arguments and we'll all be safe. Take care. Thank you, Your Honor.
judges: Roger L. Gregory, Toby J. Heytens, DeAndrea Gist Benjamin